In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-02-00225-CR


______________________________




JAMES CHARLES PORTLEY, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 124th Judicial District Court


Gregg County, Texas


Trial Court No. 29363-B




 




Before Morriss, C.J., Ross and Carter, JJ.


Opinion by Chief Justice Morriss



O P I N I O N



 James Charles Portley appeals from his conviction for attempted robbery. Portley waived
his right to indictment by grand jury and pled guilty to attempted robbery as alleged in the
information. The trial court found Portley guilty of attempted robbery and sentenced him to ten
years' imprisonment. The only issue raised on appeal is the validity of Portley's waiver of
indictment. (1)

 On December 1, 2001, a man left the Wal-Mart store in Kilgore with clothing for which he
had not paid. Wal-Mart employees pursued him unsuccessfully. As a result of a physical
confrontation with Portley during that pursuit, a Wal-Mart employee was injured. Police later
received an anonymous call reporting the thief to be Portley. A Wal-Mart employee identified
Portley as the suspect, and Portley took the police to where he had left the stolen clothing. Portley
was charged with robbery and at that time was subject to an enhanced sentence of between twenty-five to ninety-nine years or life. Later, the State dropped the robbery charge and filed an information
for attempted robbery. Portley waived his right to an indictment in writing and, subsequently,
waived indictment orally in open court. He then pled guilty to attempted robbery as alleged in the
information. The trial court found Portley guilty of attempted robbery and reset the case for
sentencing. At the sentencing hearing, Portley made an untimely motion that his plea be withdrawn. 
The trial court refused to grant the motion and sentenced him to ten years' imprisonment.

 Portley contends on appeal the trial court misstated the difference between an information
and an indictment, that Portley did not understand the difference, and that therefore he did not
knowingly, voluntarily, and intelligently waive his constitutional right to an indictment. The State
makes three responses: (1) the trial court did not misstate the difference between an information and
an indictment, (2) the written waiver was sufficient, and (3) the oral waiver was sufficient. We
believe both waivers were valid.

 An individual in Texas has a constitutional right to be indicted by a grand jury if charged with
a felony. Tex. Const. art. I, § 10. A felony prosecution must be based on an indictment, unless
indictment is waived. State v. Chardin, 14 S.W.3d 829, 831 (Tex. App.-Austin 2000, pet. ref'd). 
 An indictment may be waived in writing or orally in open court in any noncapital felony case. Tex.
Code Crim. Proc. Ann. art. 1.141 (Vernon 1977); see King v. State, 473 S.W.2d 43, 44 (Tex. Crim.
App. 1971); see also Flowers v. State, 696 S.W.2d 303, 304 (Tex. App.-Ft. Worth 1985, no pet.). 
For a waiver of indictment under Article 1.141 to be valid, it must be intelligently, voluntarily, and
knowingly given by the accused while represented by counsel. Garrett v. State, 625 S.W.2d 809,
810 (Tex. App.-Houston[14th Dist.] 1981, no pet.); see King, 473 S.W.2d at 44. When the record
reflects that a defendant waived his or her right to an indictment and such waiver fully complied with
Article 1.141, it is not error to try the defendant on a felony information. Ex parte Hunter, 604
S.W.2d 188, 190 (Tex. Crim. App. 1980). 

 The trial court admonished Portley regarding waiver of indictment by grand jury. Portley
contends the explanation that an indictment is no different than an information is an incorrect
statement of the law. The State argues, though, that the trial court's admonishment is a correct
statement of the law.

 While on a practical level there may not be much difference between an information and an
indictment, there is a difference. An information is a written statement filed and presented by the
prosecuting attorney that charges an individual with a crime. Tex. Code Crim. Proc. Ann. art.
21.20 (Vernon 1989). An information is subject to only the scrutiny of the prosecutor's office. An
indictment may be issued by a grand jury only on a finding of probable cause to believe an individual
has committed a crime. See Janecka v. State, 739 S.W.2d 813 (Tex. Crim. App. 1987); King, 473
S.W.2d 43. The framers of both the United States and Texas Constitutions deemed a grand jury to
be an important safeguard to ensure fair prosecutions. Riney v. State, 28 S.W.3d 561, 564 (Tex.
Crim. App. 2000). The grand jury allows the people of Texas, as represented by the grand jurors,
to scrutinize felony prosecutions and act as a safeguard intended to prevent felony prosecutions
without probable cause. The question before this Court is whether the trial court's statement misled
Portley such that his oral waiver was not knowing, intelligent, and voluntary.

 The trial court correctly explained that an indictment must be issued by a grand jury. It
correctly explained that the grand jury has the option of not indicting. After it made the over-simplified statement that the only difference is who signs the bill, the trial court asked Portley if he
wanted the matter submitted to a grand jury. Portley responded: "No, Sir." Portley obviously
understood that a grand jury must issue an indictment; otherwise, he would have been confused when
asked if he wanted the matter submitted to a grand jury. We believe the trial court's inaccurate
statement did not prevent Portley from intelligently, knowingly, and voluntarily waiving his right
to an indictment. No obligation exists which requires a trial court to explain all the advantages of
grand jury proceedings. Garrett, 625 S.W.2d at 810. 

 Portley had already signed a valid written waiver of his right to indictment. While the trial
court "glossed over" the differences between an indictment and an information, the record indicates
Portley understood he had a right to be indicted by a grand jury. We believe there is sufficient
evidence in the record to indicate Portley understood the waiver he was making and that his oral
waiver was made intelligently, knowingly, and voluntarily.

 Even if Portley's oral waiver had been ineffective, he nonetheless validly waived indictment. 
The record indicates Portley had already signed a written waiver before the plea hearing at which he
orally waived indictment. As the State contends, a written waiver which is given intelligently,
knowingly, and voluntarily while the defendant is represented by counsel adequately waives the
constitutional right to a grand jury indictment. Id. At the time he signed the written waiver, Portley
was represented by counsel. In the waiver, Portley acknowledges he is making the waiver
voluntarily and knowingly. We have not been presented with any evidence to dispute he made the
written waiver knowingly and voluntarily. A written waiver meeting the requirements of Article
1.141 can be sufficient to waive one's right to an indictment. Gonzales v. State, 684 S.W.2d 768,
771 (Tex. App.-Waco 1984, no pet.). We believe the written waiver in this case is sufficient to
validly waive Portley's constitutional right to an indictment.

 We conclude Portley effectively waived his right to an indictment both orally and in writing. 
Therefore, we affirm the judgment. 

 Josh R. Morriss, III

 Chief Justice


Date Submitted: April 21, 2003

Date Decided: May 28, 2003


Publish
1. In discussing his point of error, Portley complains his plea of guilty was not voluntary but
does not allege this as an issue on appeal. While the State responded to Portley's voluntariness
complaint in the State's brief, this issue was not argued as a point of error allowing both sides to
present full and developed arguments. Since this issue is not before us, we will not address it.



tions to actions to fraudulent transfers and obligations." Unif. Fraudulent
Transfer Act § 9, 7A-2 U.L.A. 266, 359 cmt. (1999). The means of securing that goal effectuated
by the provision is to ensure that the "lapse of the statutory periods prescribed by the section bars the
right and not merely the remedy." Id. In so doing, unlike a traditional statute of limitations, the
extinguishment provision places a substantive condition on the accrual of a fraudulent transfer
action. United States v. Bacon, 82 F.3d 822, 823-24 (9th Cir. 1996). The provision abolishes the
right to bring a fraudulent transfer action if the action is not brought within the established time
limits. Although it appears that no Texas court has considered this particular issue, we can find no
reason to construe Texas law any differently than the drafters of UFTA intended. We find that
Section 24.010 operates as a statute of repose rather than as a procedural statute of limitations. A
claim must be brought within the statutory time limitations or it may not be brought at all. 

 Charles Duran conveyed two parcels of real property. He conveyed the first parcel, which
consisted of approximately 165 acres, (3) to the Duran Family Trust on November 28, 1995,
specifically excluding and reserving one acre and the house as his homestead. (4) Then, on July 10,
1996, Duran conveyed this one acre and house to his daughter, Christie Patterson, specifically
reserving to himself a life estate. The Hendersons alleged, and the trial court found, that it was in
October of 1999, during depositions for the second suit against Charles Duran for conversion and
recovery of the proceeds of the note, that the Hendersons learned for the first time about these
conveyances. The Hendersons filed their original petition in the present suit on April 27, 2000. 
Thus, they filed their petition approximately four years and five months after the first property
conveyance (the 165 acres to the Duran Family Trust); three years, nine and one-half months after
the second conveyance (the one acre and home to Christie Patterson); and six months after the
Hendersons claim to have first become aware of the conveyances. 

 As stated previously, the Hendersons' claim was extinguished if they did not bring suit within
four years from the time of the conveyances or, if later, within one year from the time at which they
knew or could reasonably have known about the conveyances. The Hendersons' suit was clearly not
brought within four years of the first conveyance, but it was brought within four years of the second
conveyance. Therefore, the Hendersons' suit with respect to the second conveyance was timely. 
With regard to the first conveyance, both conveyances were filed in the deed records with the county
clerk almost immediately after they were executed. Duran argues that we should impute constructive
knowledge of the conveyances to the Hendersons from the time of the records filing. Under their
analysis, because suit was not brought within four years nor within one year of the public filings
from which they could and should reasonably have discovered the transfers, their claim was
extinguished. Duran directs us to no authorities whatsoever in support of this argument. 

 The one year provision of Section 24.010 is similar to the discovery rule applicable to general
fraud claims. Although we have already held that the extinguishment provision of TUFTA is
different in effect than a traditional statute of limitations, we find it helpful to analogize to the
discovery rule. The discovery rule provides that a claim for fraud does not accrue, and thus the
limitation period does not begin to run, until the fraud is discovered, or in the exercise of reasonable
diligence should have been discovered. Ruebeck v. Hunt, 142 Tex. 167, 176 S.W.2d 738, 739
(1943). Ordinarily, what constitutes reasonable diligence to discover fraud is a question of fact for
the jury. Id. at 740. Unless the evidence is such that reasonable minds may not differ as to its effect,
the question of whether a party has exercised diligence in discovering fraud is for the fact finder. 
A creditor's cause of action to set aside a fraudulent conveyance accrues when the creditor acquires
knowledge of the fraud, or would have acquired such knowledge in the exercise of ordinary care.
Eckert v. Wendel, 120 Tex. 618, 623 (1931). And registration of a fraudulent conveyance at a certain
date in public records is merely one circumstance bearing on the creditor's actual or presumed
knowledge. Id. 

 We see no reason why the same principles should not apply in the context of Section 24.010. 
Whether the Hendersons filed their claim within one year of the time when they knew or reasonably
could have known about the conveyances was a question of fact for the fact finder. Other than
pointing out that E. G. Henderson admitted knowing in what county Charles Duran's parents had a
home in which he occasionally lived, Duran presents no argument or authorities explaining why the
Hendersons had a particular duty to investigate the real property records in that county. The facts
show that the money Charles Duran owed to the Hendersons from the note was not in any way
related to the real property that Duran conveyed, and the deeds were not in the Hendersons' chain
of title. See Cherry v. Farmers Royalty Holding Co., 138 Tex. 576, 160 S.W.2d 908 (1942);
Southwest Title Ins. Co. v. Woods, 449 S.W.2d 773 (Tex. 1970). Cf. Murphy v. Campbell, 964
S.W.2d 265 (Tex. 1997); Mooney v. Harlin, 622 S.W.2d 83, 85 (Tex. 1981). In these circumstances,
we find the public filings were but one consideration and do not of themselves raise a presumption
of constructive knowledge. We find the evidence sufficient to conclude that the Hendersons neither
knew nor could reasonably have known about the conveyances until such time as depositions were
taken in the second suit against Duran and, therefore, in addition to the second conveyance, the trial
court properly had jurisdiction over the Hendersons' claim with respect to the first conveyance. 

 Duran's second major complaint is that there is no evidence or legally insufficient evidence
to support the trial court's findings concerning Charles Duran's debt and his intent to hinder, delay,
or defraud the Hendersons.

 In considering a legal sufficiency or "no evidence" point, we consider only the evidence that
tends to support the court's findings and disregard all evidence and inferences to the contrary. Garza
v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965); Worsham Steel Co. v. Arias, 831 S.W.2d 81, 83 (Tex.
App.-El Paso 1992, no writ). A no-evidence point will be sustained when (a) there is a complete
absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving
weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact
is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital
fact. Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex. L.
Rev. 361, 362-63 (1960). When we sustain a no-evidence point, we render judgment for the
appellant. Vista Chevrolet, Inc. v. Lewis, 709 S.W.2d 176 (Tex. 1986).

 We will consider Charles Duran's debt to the Hendersons first. The trial court found the
evidence legally and factually sufficient to establish a violation of Section 24.005(a)(1) of TUFTA. 
This statute, entitled "Transfers Fraudulent as to Present and Future Creditors" reads in relevant part: 

 A transfer made or obligation incurred by a debtor is fraudulent as to a creditor,
whether the creditor's claim arose before or within a reasonable time after the transfer
was made or the obligation was incurred, if the debtor made the transfer or incurred
the obligation with actual intent to hinder, delay, or defraud any creditor of the
debtor. . . .

Tex. Bus. & Com. Code Ann. § 24.005(a)(1) (Vernon Supp. 2002).

Duran claims that the Hendersons failed to prove that Charles Duran was in fact indebted to them
on the date of the first property conveyance, November 28, 1995, and that he did not become a
debtor to the Hendersons, if at all, until the date on which the judgment in the second suit for
conversion was rendered, January 19, 2000. We first note that the statute does not require that
Charles Duran have been a debtor to the Hendersons on the date of the first property conveyance. 
It requires only that he have been such a debtor either before or within a reasonable time after the
conveyance. However, because the trial court made an affirmative finding that Charles Duran
received and converted the note proceeds before the first conveyance, we must inquire into whether
this finding was supported by legally sufficient evidence. 

 A "debtor" is a person who is liable on a claim. Tex. Bus. & Com. Code Ann. § 24.002(6). 
A "claim" means a right to payment or property, whether or not the right is reduced to judgment,
liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal,
equitable, secured, or unsecured. Tex. Bus. & Com. Code Ann. § 24.002(3). We recognize, as
Duran correctly points out, that the first suit against Charles Duran did not make the Hendersons his
creditors. It only awarded the Hendersons a one-half interest in the net proceeds of a note receivable
that had not yet become mature. However, by virtue of that first suit, whereby the Hendersons were
awarded the one-half interest in the note, as soon as Charles Duran was paid the full value of the note
he became liable to the Hendersons for their share. As the statutory definitions make clear, the
Hendersons did not need to obtain a judgment against Charles Duran for conversion, which they in
fact eventually did, in order for him to become a debtor to them within the meaning of the statute. 
 The note had a maturity date of December 29, 1996. The date of the first property
conveyance was November 28, 1995. In its briefs, Duran does not dispute that the obligee on the
note paid it before the maturity date. At trial, Charles Duran's daughter, Christie Jean Patterson,
testified that she was aware at the time of trial that her father had received the note proceeds
sometime in August of 1995. E. G. Henderson testified that "around Christmas" of 1996 he learned
that the note had been paid in the summer of 1995. All of this testimony was without objection. 
Finally, the trial court took judicial notice of the judgment from the second suit wherein Charles
Duran was held liable for conversion of the note proceeds. We find this evidence legally sufficient
to establish that Charles Duran received the note proceeds in August of 1995, and thus that he was
in debt to the Hendersons before and at the time of each property conveyance.

 Duran also challenges the legal sufficiency of the evidence to support the trial court's findings
that Charles Duran intended to hinder, delay, or defraud the Hendersons. This finding was a basis
for the trial court's ruling that the conveyances were fraudulent and should be set aside. Because we
find that the conveyances could not be in fraud of the Hendersons because they were of Charles
Duran's homestead, this finding of intent becomes irrelevant and we need not discuss it further.

 Duran's third complaint may be classed as three-fold: the property transferred in both
conveyances was homestead property; the homestead claim to the 165 acres was not abandoned by
Charles Duran's transfer of such property to the Family Trust; and homestead property is not subject
to TUFTA.

 Although amended in 1997, the Texas Constitution provided then as it does now that, with
certain exceptions not applicable here, the homestead of a family or of a single adult person is
protected from forced sale for the payment of most debts. See Tex. Const. art. XVI, § 50 (amended
1997). A rural homestead may consist of not more than 200 acres for a family or 100 acres for a
single adult. See Tex. Prop. Code Ann. § 41.002(b) (Vernon 2000). The rural status and general
homestead character of the land before the conveyances were made is not in dispute. However, the
parties do dispute whether Charles Duran and the other occupants of his home were "a family" for
homestead purposes, and thus whether Charles Duran could claim100 or 200 acres as his homestead.

 For over a century, within the context of homestead law, Texas courts have held that the
family relation is one of status; that the head of the family must be legally or morally obligated to
support at least one other family member; and additionally there must be a corresponding
dependence on the other member for this support. Roco v. Green, 50 Tex. 483, 490 (1878); NCNB
Tex. Nat'l Bank v. Carpenter, 849 S.W.2d 875, 879 (Tex. App.-Fort Worth 1993, no writ); Henry
S. Miller Co. v. Shoaf, 434 S.W.2d 243, 244 (Tex. App.-Eastland 1968, writ ref'd n.r.e.). A family
may include a parent and his or her adult child, provided that the parent is under an obligation to
support the adult child and the child is dependent on the parent for support. See, e.g., In re Hill, 972
F.2d 116 (5th Cir. 1992).

 Before he made the conveyances, Charles Duran was unmarried and owned a home situated
on approximately 165 acres. In 1994 his adult daughter, Christie Patterson, and his grandson, 
Christie Patterson's son, moved in with him. He received social security income of $800.00 per
month, and Christie Patterson testified that the three of them depended on it for their support. There
was also a cattle lease on the land that provided about $1,000.00 per month, but this money went to
the trust, and the trust benefitted all of Charles Duran's children. In the summer of 1997, Christie
Patterson became the legal guardian of her father's person and estate because he became
incapacitated. At least from that time, Christie Patterson was unable to obtain any outside
employment. Although it is unclear to what extent she provided for Charles Duran's care before he
became incapacitated, he appears to have had at all times a moral obligation to provide for his
daughter and grandchild, and he provided such support at least to the extent of the social security
check. They were clearly not simply living together and sharing expenses, as the Hendersons
implicitly argue. Given these facts and the liberality with which we are to construe the constitutional
and statutory provisions that protect homestead exemptions, see Whiteman v. Burkey, 115 Tex. 400,
403, 282 S.W. 788 (1926), we find that a familial relationship has been adequately demonstrated. (5) 
Thus, because the land was rural and Charles Duran was the head of a family, he was entitled to
claim the home and the surrounding 165 acres as his homestead before he made the conveyances. 

 The trial court concluded that Charles Duran effectively designated the one acre and home
as his homestead, but that the homestead character of the surrounding 165 acres was lost when
Charles Duran transferred it to the family trust. Duran challenges this conclusion. Once a
homestead claimant has established the homestead character of the property, the burden shifts to the
creditor to disprove the continued existence of the homestead. See Sullivan v. Barnett, 471 S.W.2d
39, 43 (Tex. 1971); Lifemark Corp. v. Merritt, 655 S.W.2d 310, 314 (Tex. App.-Houston [14th
Dist.] 1983, writ ref'd n.r.e.). Once acquired, homestead rights are not easily lost. Property may lose
its homestead character only by the claimant's death, abandonment, or alienation. Garrard v.
Henderson, 209 S.W.2d 225, 229 (Tex. App.-Dallas 1948, no writ).

 We need not decide whether the conveyance to the family trust effectively waived Charles
Duran's homestead claim to the property. This is because, even assuming for the purpose of
argument that the conveyance was a complete alienation that resulted in Charles Duran losing his
homestead claim to the property, the conveyance would still not result in the property being subject
to the claims of Charles Duran's creditors. TUFTA applies to the transfer of "assets," the definition
of which explicitly excludes property that is exempt under nonbankruptcy law. See Tex. Bus. &
Com. Code Ann. §§ 24.002(2); 24.002(12); 24.005. Furthermore, it is well settled that a
conveyance of exempt property may not be attacked on the ground that it was made in fraud of
creditors. Chandler v. Welborn, 156 Tex. 312, 294 S.W.2d 801 (1956); Crow v. First Nat'l Bank
of Whitney, 64 S.W.2d 377, 379 (Tex. Civ. App.-Waco 1933, writ ref'd); Dulaney v. Lawler, 282
S.W. 321, 322 (Tex. Civ. App.-Texarkana 1926, no writ). The rationale for this rule is that because
the law already has removed the homestead property from the reach of creditors, the conveyance of
the property, whether fraudulent or not, does not deprive the creditors of any right they had against
the property. Wood v. Chambers, 20 Tex. 247, 254 (1857); Radney v. Clear Lake Forest Cmty.
Ass'n, Inc., 681 S.W.2d 191, 197 (Tex. App.-Houston [14th Dist.] 1984, writ ref'd n.r.e.); Matador
Land & Cattle Co. v. Cooper, 87 S.W. 235, 236 (Tex. Civ. App. 1905, no writ). It follows that a
debtor may sell exempt property or give it away and pass title as against his creditors. See, e.g., Wills
v. Mike, 76 Tex. 82, 13 S.W. 58 (1890); Johnson v. Echols, 21 S.W.2d 382, 384 (Tex. Civ.
App.-Eastland 1929, writ ref'd); Russell v. Adams 293 S.W. 264, 270 (Tex. Civ. App.-Dallas 1927),
aff'd, 299 S.W. 889 (Tex. Comm'n App. 1927, holding approved). Charles Duran had the power and
the right to convey title to his homestead property to the Duran Family Trust free of any claim of his
creditors. 

 We note, however, that the general rule that a conveyance of exempt property may not be
attacked on the ground it was made in fraud of creditors is not without limitation. If a deed to 
homestead property is not made with intent, as between the grantor and grantee, that the title should
vest in the latter, but is made for the purpose of giving an apparent right only for the purpose of
protecting it against the claims of the original owner's creditors after he should cease to use it for the
purpose that gave the exemption, it would be subject to seizure and sale to pay his debts when the
exemption ceased. Taylor v. Ferguson, 87 Tex. 1, 26 S.W. 46, 48 (1894). This limitation applies
only where the original owner actually ceases to use the land for homestead purposes. See Beard
v. Blum, 64 Tex. 59, 62 (1885); Hughes v. Parmer, 164 S.W.2d 576, 577 (Tex. Civ. App.-Austin
1942, no writ). This limitation to the general rule obviously prevents a party from circumventing
the requirement that a homestead actually be used for the purposes that give rise to the exemption. 
 In our case, there is no evidence that the conveyance was a sham transaction to allow Charles
Duran to retain rights in the property while ending its homestead use. The only evidence relied on
by the Hendersons to show that the homestead character of the property was lost is the mere fact of
the conveyance. This is insufficient to show the applicability of the limitation just explained. 
Therefore, the general rule that a conveyance of exempt property may not be attacked on the ground
that it was made in fraud of creditors applies in this case. 

 The constitutional protections afforded homestead rights as well as the explicit provisions
of TUFTA make it clear that the conveyance of a homestead may not be set aside as in fraud of
creditors. The trial court erred in finding that Charles Duran waived his homestead claim in the 165
acres by conveying the land to the Family Trust. Thus, it was error to set the conveyance aside and
subject it to the Hendersons' claim. The trial court also set aside Charles Duran's conveyance of the
home and surrounding one acre. The court did so despite the fact that it concluded that Charles
Duran had effectively reserved this property as his homestead. This was also error. Consequently,
we reverse that portion of the judgment that ordered the two conveyances set aside and the 165 acres
sold to satisfy the Hendersons' claim, and we render judgment that the Hendersons take nothing on
those claims. As Duran does not challenge the seizure of the monies, that portion of the judgment
is affirmed. 


 William J. Cornelius

 Chief Justice


Date Submitted: January 31, 2002

Date Decided: February 22, 2002


Publish
1. Charles Duran died shortly after the trial court's judgment nunc pro tunc was rendered but
before the court's findings of fact and conclusions of law were entered.
2. A statute of repose in a general sense is a legislative enactment that sets a period of time
within which an action may be brought. A statute of limitations is technically a category of repose
statute. See Black's Law Dictionary 1423 (7th ed. 1999). However, we will follow the
conceptually more precise practice of referring to "statute of repose" as a distinct type of statute
different in purpose and implementation from a statute of limitations. See Susan C. Randall, Due
Process Challenges to Statutes of Repose, 40 Sw.L.J. 99 7, 1002 (1986); see also Francis E.
McGovern, The Variety, Policy and Constitutionality of Product Liability Statutes of Repose, 30 Am.
U. L. Rev. 579 (1981) (describing several different definitions of statute of repose and the
inconsistent use of these definitions by courts and commentators).
3. The Warranty Deed to this property describes three tracts of land. The first tract is
purported to contain 14.94 acres, the second tract 14.731 acres, and the third tract 136 acres, for a
total of 165.671 acres. The Hendersons refer to this property as a 165-acre tract; Charles Duran and
Christie. Patterson refer to it as 160 acres; and Patresa Gilbert refers to it as 136 acres. For the sake
of simplicity and because the difference between these three numbers is not dispositive, we will
describe it as approximately 165 acres.
4. Hereinafter when we refer to the 165 acres, we will not be referencing the one acre and the
house, even though the latter is technically geographically included within the former. Rather, we
will be referring to the entire 165 acres except for the acre and house, to which we will refer
separately.
5. The record does not make clear whether Christie Patterson is married or not, only that she
has a child. Whether or not she is married, the record makes clear by implication that she does not
live with or receive support from any husband. Even if she were married, in these circumstances a
family relation would still be established. See, e.g., In re Hill, 972 F.2d 116 (5th Cir. 1992) (debtor,
debtor's married daughter, and grandchild comprise a family under Texas homestead law where the
married daughter is financially dependent on the father and does not live with or receive support
from the husband).